1  Hani Z. Sayed (State Bar No. 224233)
   hsayed@rutan.com
2  Bradley A. Chapin (State Bar No. 232885)
   bchapin@rutan.com
3  Sarah Van Buiten (State Bar No. 324665)
   svanbuiten@rutan.com
4  RUTAN & TUCKER, LLP
   18575 Jamboree Road, 9th Floor
5  Irvine, CA  92612
   Telephone:   714-641-5100
6  Facsimile:    714-546-9035

7  Attorneys for Plaintiff
   WALKER PRODUCTS, INC., a Missouri
8  corporation

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WALKER PRODUCTS, INC., a Missouri corporation,<br><br>Plaintiff,<br><br>vs.<br><br>GEOFFREY A. WILSEY, an individual; JINHUA "FLORIA" XIE, an individual; INQBRANDS, INC., a California corporation; and DOES 1-10, inclusive,<br><br>Defendants. | Case No.<br><br>Judge:<br><br>**COMPLAINT FOR:**<br><br>**(1) TRADE SECRET MISAPPROPRIATION (18 U.S.C. § 1836);**<br>**(2) TRADE SECRET MISAPPROPRIATION (Cal. Civ. Code § 3426);**<br>**(3) BREACH OF CONTRACT; AND**<br>**(4) INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Walker Products, Inc. ("Walker") alleges as follows:

# INTRODUCTION

1.     Walker began serving the automotive industry in 1946 and has since grown to one of the largest privately owned supplier of fuel system components and engine sensors.  During its decades in business, Walker has invested millions of dollars on engineering research including the purchase of thousands of original equipment ("OE") samples and has developed proprietary processes and information that have enabled Walker to efficiently deliver quality automotive products to its customers, which has given Walker a competitive advantage in its industry and creates significant value for Walker.

2.     Geoffrey A. Wilsey ("Wilsey") had worked for Walker from January 2014 through March 2021 as its Vice President of Sales & Marketing.  Upon commencing his employment, on January 14, 2014, Wilsey signed an Inventions and Confidential Information Agreement, through which he agreed to protect Walker's confidential information.  Unbeknownst to Walker, however, Wilsey began taking steps at the end of 2020 to exploit Walker's proprietary information and thereby unfairly compete with Walker upon his resignation, doing so in collaboration with Jinhua "Floria" Xie ("Xie") and InQBrands, Inc. ("InQBrands"), for which Xie served as Vice President.

3.     Nonetheless, Walker could not have discovered this wrongdoing until late 2024, at which point Walker finally obtained documents from a third-party (in connection with a separate lawsuit) showing Defendants' brazen acts of misappropriation, which began while Wilsey was still employed by Walker.  Until then, Wilsey adamantly maintained that he retained no confidential information from his employment with Walker and used no such information in his subsequent ventures, which assertions Xie and InQBrands echoed.  Although Walker had diligently sought to obtain any documents and information that would reveal Defendants' wrongdoing, Defendants had successfully thwarted these efforts.

4. Accordingly, Walker brings this Complaint for misappropriation of trade secrets under both 18 U.S.C. § 1836 *et seq.* and California Civil Code § 3426 *et seq.*, breach of contract, and intentional interference with an economic advantage.

## JURISDICTION

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Walker asserts federal claims under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831, *et seq.* The Court has supplemental jurisdiction over Walker's remaining claims, which form part of the same case or controversy as the federal question claims, pursuant to 28 U.S.C. § 1367.

6. This Court has personal jurisdiction over Wilsey because Wilsey resides in Riverside County, California.

7. This Court has personal jurisdiction over Xie because Xie resides in San Bernardino County, California.

8. This Court has personal jurisdiction over InQBrands, Inc. ("InQBrands") because it is a California corporation with its principal place of business in San Bernardino County, California.

9. Venue is proper in this district under 28 U.S.C. § 1391(b)(1), in that Defendants reside in this District, and under 28 U.S.C. § 1391(b)(2), in that a substantial part of the events or omissions giving rise to the claim occurred in this District, as Defendants engaged in their misappropriation and unfair business practices from this District.

## PARTIES

10. Plaintiff Walker Products, Inc. ("Walker" or "Plaintiff") is a corporation organized and existing under the laws of the State of Missouri.

11. Defendant Geoffrey A. Wilsey ("Wilsey") is an individual residing in Riverside County, California.

12. Defendant Jinhua "Floria" Xie ("Xie") is an individual residing in San Bernardino County, California.

13. Defendant InQBrands, Inc. ("InQBrands") is a corporation organized and existing under the laws of the State of California, with its principal place of business in San Bernardino County, California.

14. Walker is presently unaware of the true names and capacities, whether individual, corporate, associate, or otherwise, of defendants named herein as Does 1 through 10, inclusive, and therefore sues those Doe defendants by fictitious names. Each of the fictitiously named defendants is legally responsible in some manner for the acts, omissions, events, and occurrences as alleged herein, and proximately caused damages and injury to Walker as alleged herein. Walker will seek leave to amend this Complaint to state the true names and capacities of such fictitiously-named defendants after ascertaining their identities. Wilsey, Xie, InQBrands, and Does 1 through 10 are referred to herein as "Defendants."

15. Walker is informed and believes, and based thereon alleges, that at all relevant times certain of the defendants, including the Doe defendants, were (unless alleged otherwise) acting as the agents, servants, employees, alter egos, or successors or predecessors in interest of other defendants, acting within the course and scope of such relationship.

## GENERAL ALLEGATIONS

### Walker

16. Since 1946, Walker has been committed to serving its customers in the automotive industry. After devoting decades to that commitment, Walker has become one of the largest privately owned suppliers of fuel system components and engine sensors. Indeed, Walker sells a wide variety of automotive products including fuel delivery components, emission control products, engine sensors, and ignition components. Walker sells its products to manufacturers, retailers, exporters, and distributors for resale. Walker sells both aftermarket and OEM (*i.e.*, original equipment manufacturer) components.

17. As one of its proprietary product offerings, Walker sells an oxygen

sensor, which is a device that determines the oxygen content of the exhaust gas for sake of monitoring combustion efficiency and the air-to-fuel ratio. Walker has cultivated valuable relationships with reliable customers that purchase these sensors from Walker, including: (1) the largest retailer of aftermarket automotive parts in the United States, and (2) one of the largest automotive performance parts manufacturers and distributors in the United States (both together, the "Sensor Customers").

18. Walker had longstanding, lucrative relationships with the Sensor Customers and, before the wrongful acts alleged herein, made substantial sales of oxygen sensors to the Sensor Customers on a consistent basis, such that these relationships provided a reasonably probable future economic benefit to Walker.

**Walker's Trade Secrets**

19. Through more than seventy years of industry experience, tireless work, and substantial economic investment, Walker has developed valuable relationships with its confidential suppliers/vendors and customers, as well as proprietary processes for manufacturing its automotive products in conformity with confidential customer specifications, which has resulted in Walker's success and long-lasting relationships with its customers. Put otherwise, Walker has gathered a wealth of proprietary knowledge regarding the standards and specifications of each particular customer, developed reliable and efficient processes to manufacture components that meet said standards and specifications, and accumulated a network of reliable vendors and suppliers that provide compliant parts and other supplies.

20. Like its other proprietary automotive components, Walker's oxygen sensors are manufactured to meet and exceed all original equipment specification and test requirements. Thus, developing a successful and robust oxygen sensor program has required that substantial investment of time and money from Walker's in-house manufacturing, product management, purchasing, quality control, and engineering teams, among others, to cultivate the oxygen sensor manufacturing

process in compliance with regulatory standards across geographic regions; detailed knowledge of customer needs, volume demands, and pricing and other preferences; reliable vendors offering services at costs that permit sales within competitive price ranges and ensure logistical stability, particularly cross-border; and manufacturers that can supply the sensors and components thereof per the aforementioned customer specifications, while meeting certain price points, quality standards, productivity requirements, and logistical hurdles (together, the "Trade Secrets").

21.  Put otherwise, the Trade Secrets constitute an amalgam of proprietary information required to offer a robust, lucrative, and successful oxygen sensor program, as developed through a rigorous research and development process, decades of industry expertise, and countless employee hours.

22.  Walker takes substantial steps to protect the Trade Secrets and prevent the improper disclosure and dissemination thereof.

23.  Walker limits access to the Trade Secrets to those employees who require such access to perform their jobs.  Walker requires each of its employees with access to the Trade Secrets to safeguard the information and keep it confidential and internal to Walker.  In exchange for employment with Walker and compensation for the same, Walker's employees sign a contract in which they agree to maintain the confidentiality of its proprietary information and refrain from exploiting such information post-employment.  Walker's employees understand that the Trade Secrets are proprietary to Walker and are to be maintained in confidence.  Also, Walker's vendors and suppliers often sign agreements with exclusivity clauses, requiring that vendor to treat Walker as its exclusive distributor and refrain from disclosing certain data and information belonging to Walker.

24.  Walker derives significant independent economic value from maintaining the confidentiality of the Trade Secrets.  Disclosure of the Trade Secrets to competitors and/or the public would irreparably damage Walker (and has damaged Walker) by diminishing its competitive advantage over competitors and

enabling its competitors to leverage years of learned information from Walker to release competing products into the market without expending significant resources to develop such products and bring those products to the market on a reliable, consistent basis while meeting certain price points and volume needs and navigating logistical hurdles.

**Wilsey's Employment with Walker**

25. In January 2014, Walker hired Wilsey to perform the role of Vice President of Sales & Marketing. Due to the nature of this role, Wilsey was provided confidential access to proprietary customer, vendor, and supplier information. Thus, on January 14, 2024, Wilsey signed an agreement titled: "Employee Agreement – Inventions and Confidential Information," a true and correct copy of which is attached hereto as **Exhibit A**. (The "Confidentiality Agreement.")

26. The Confidentiality Agreement provides in relevant part: "[A]ny such inventions, discoveries and improvements and any technical data, information or know-how made, discovered or conceived or acquired by me in the course of my employment and relating to the Company' business (other than information of public knowledge), whether patented or not, are to be and remain the property of the Company. [¶] [] I will not without the authorization of the Company, disclose to any person outside of the Company or use at any time (or subsequent to my said employment) any trade secrets, technical data, know-how or business information such as price lists, customer lists, vendor lists, cost estimating documents, etc. relating to the Company's product, processes, methods, equipment and business practices which I have acquired during my employment until such information shall have become public knowledge."

27. Thus, like other Walker employees, Wilsey knew or should have known that the Trade Secrets and other confidential information were to be maintained in confidence and had significant value because of the fact that they were kept secret.

28. After more than seven years of working for Walker, Wilsey resigned in March 2021 and began working for InQBrands. Just months after Wilsey began working for InQBrands, InQBrands introduced a new robust line of automotive components under the "NERNEX" brand, touting these components at industry trade shows. As far as Walker knew, InQBrands had not previously offered any such automotive components. Walker expressed its concerns regarding the timing of InQBrands' introduction of these competing components, which occurred within months of Wilsey resigning from Walker. However, both Wilsey and InQBrands insisted that Wilsey had retained no documents/information from his employment with Walker and had used none of Walker's confidential information upon joining InQBrands. At that point, Walker had no evidence to the contrary and thus accepted these representations.

## Defendants' Wrongdoing

29. Unbeknownst to Walker, during Wilsey's employment with Walker, Wilsey began undermining Walker's business interests by taking affirmative steps to launch a competing venture and thereby violated his duty of loyalty to Walker. *See, e.g.*, Cal. Lab. Code § 2863. These wrongful actions laid the groundwork for Defendants' tortious diversion of Walker's most reliable and lucrative Sensor Customers.

30. On October 13, 2020, *i.e.*, during Wilsey's employment with Walker, Wilsey and Xie held a meeting with another Walker employee, Yue "Frank" Cong ("Cong"). That meeting apparently went well; the following month, in November 2020, Cong and Xie exchanged emails regarding the development of a competing automotive components business, *i.e.*, "NERNEX," which would be launched through the collaboration of Xie's employer, InQBrands, and a Chinese business with Cong was affiliated. On information and belief, Wilsey supported these efforts to develop the competing "NERNEX" brand during his final months at Walker, thus violating his duty of loyalty to Walker.

31. Also unknown to Walker until recently, Wilsey began soliciting business from the Sensor Customers by July and August of 2021, again, just months after resigning from Walker. On July 2, 2021, for example, Wilsey emailed one of the Sensor Customers, stating that InQBrands' NERNEX automotive parts division offered a full catalogue of sensors that could "meet[] 100% of all [its] requirements" and comparing its product offerings to the sensors offered by its "current programmer," *i.e.*, Walker. Without the misappropriation of Trade Secrets, Wilsey and InQBrands could not have developed and sold a full catalogue of sensors that meet the requirements of the Sensor Customers within a period of several months, nor could they have offered these components at reduced price points while meeting their volume needs.

32. On information and belief, Defendants contacted Walker's vendors to sell them oxygen sensors made with the confidential specifications required to meet the needs of the two Sensor Customers and unknown other Walker customers. From his employment with Walker, Wilsey learned certain proprietary information – e.g., the capabilities of Walker's vendors/suppliers; Walker's proprietary manufacturing processes; and the Sensor Customers' specifications, standards, pricing, and volume needs – which he then exploited for sake of developing a competing robust line of oxygen sensors, poaching Walker's customers, and undermining Walker's sales of oxygen sensors. Xie and InQBrands knowingly facilitated these efforts and reaped the profits of their participation in the misappropriation of Walker's Trade Secrets.

33. As a result of this misconduct, the Sensor Customers each pulled all or substantially all of their business from Walker by the end of 2023, resulting in Walker's loss of millions of dollars in profits annually. As the Vice President of Sales & Marketing, Wilsey knew of Walker's existing and long-standing economic relationships with the Sensor Customers. Wilsey intentionally interfered with Walker's economic relationships with its Sensor Customers. Walker has been damaged by Wilsey's actions by, among other things, losing sales revenue that

would have been attained by Walker if not for Defendants' unlawful interference.

34. Without exploitation of the Trade Secrets, Defendants could not have produced and sold these competing products so quickly, nor would they have known how to obtain such products from Walker's proprietary vendors, and sell them to Walker's customers, while meeting the customers' confidential specifications, volume needs, price points, and quality standards. Without exploiting the Trade Secrets, Defendants could not have known of these customers' product specifications/needs, nor how to develop/obtain products in compliance with those specifications/needs.

35. On information and belief, Defendants have used and continue to use the Trade Secrets, and other confidential information, to solicit Walker's customers and prospective customers. On information and belief, Defendants have been soliciting additional Walker customers to their competing business.

36. If Defendants had not had access to, known of, and/or misused the Trade Secrets, then Defendants would have been required to design, source, test, validate, and engineer their own processes and products from scratch, which would have taken decades to accomplish at significant financial expense to Defendants, if they could have been developed at all. Also, Defendants would have needed to invest substantial resources in finding reliable suppliers/customers, as well as developing a repository of knowledge regarding unique customer needs.

37. On information and belief, Defendants' use of the Trade Secrets has created a significant but unfair competitive advantage for Defendants.

38. On information and belief, Defendants knowingly and improperly used the Trade Secrets to unfairly compete with Walker.

39. On information and belief, Defendants coordinated a scheme to misappropriate the Trade Secrets and use those Trade Secrets to steal Walker's customers, damage Walker's reputation, and cause economic harm to Walker.

40. Walker has been, and will continue to be, harmed by Defendants'

actions because it has lost sales, revenues, and profits, suffered damage to its reputation, both with customers and vendors, and has been forced to dedicate resources to countering Defendants' illegal scheme, for example, by increasing its marketing and sales efforts to avoid losing further business to Defendants' unfair use of the Trade Secrets.

41. In addition, on information and belief, Defendants have publicized Walker's Trade Secrets, as well as the identities of Walker's confidential supply chain partners. This confidentiality can never be restored and has undermined Walker's competitive advantage.

42. The damage to Walker's reputation and competitive advantage related to the Trade Secrets caused by Defendants' actions is irreparable.

43. Wilsey's wrongful disclosure and use of Walker's proprietary information, including the Trade Secrets, constitutes a breach of the Confidentiality Agreement.

44. Furthermore, Defendants' aforementioned intentional actions have disrupted Walker's relationships with the Sensor Customers with regard to products other than oxygen sensors, including throttle position sensors and idle air control stepper motors. On information and belief, Defendants sell these components to the Sensor Customers under the same "NERNEX" brand developed during Wilsey's employment with Walker and, based on his employment with Walker, Wilsey knew of Walker's economic relationships with the Sensor Customers, yet nonetheless sought to displace Walker as the Sensor Customers' supplier. Wilsey's intentional interference with these relationships has resulted in a decline in Walker's sales and diminution of Walker's competitive standing in the marketplace.

**Walker's Eventual Discovery of Defendants' Wrongdoing**

45. As noted previously, Walker was suspicious of InQBrands' unexpected entry into the automotive components industry with a robust line of product offerings only months after Wilsey joined the company. When Walker expressed

some concerns in late 2021, both Wilsey and InQBrands responded by insisting that no misconduct had occurred. In fact, InQBrands – through Xie – responded by threatening to bring legal claims against Walker, accusing Walker of "maliciously damaging [its] business reputation" and "reserv[ing] all rights to pursue a full range of legal remedies against any such unfair competition" by Walker. At that point, Walker had no evidence to the contrary and accepted these adamant denials.

46. Also, as noted previously, Defendants worked in partnership with another former employee of Walker, Yue "Frank" Cong ("Cong"). In an attempt to conceal their wrongdoing from Walker, Defendants and Cong intentionally contrived separation between their ventures. Thus, after leaving his employment with Walker, Cong conducted business through his own entities, including All Automotive Megahub, Inc. ("AAM"), United American Manufacturing Company, LLC ("UAMC"), and, eventually, Nernex LLC; he did not overtly affiliate himself with Defendants. Then, in mid to late 2023, AAM began offering its competing sensors at trade shows and online. Walker analyzed the sensors and concluded that they had originated from a manufacturer with which Walker had an Exclusivity Agreement. Hence, on November 22, 2023, Walker brought suit against Cong and AAM. In his initial discovery responses in early 2024, Cong stated under penalty of perjury that he had no communications nor business relationships with any employee of InQBrands, including Xie and Wilsey.

47. In connection with the lawsuit against Cong, Walker subpoenaed InQBrands and Wilsey for documents related to their business dealings with Cong. InQBrands produced only one document (a receipt for a trademark filing), and Wilsey insisted through counsel that he lacked any responsive documents. For example, Walker sought "All COMMUNICATIONS between YOU and CONG RELATING TO oxygen sensors," in response to which Wilsey stated that "no such DOCUMENTS have ever existed." In December 2024, Walker took the oral depositions of Xie (*i.e.*, personally and on behalf of InQBrands) and Wilsey. Xie

testified that: (i) she was not familiar with AAM, aside from helping facilitate its trademark registration, (ii) AAM conducted no business with InQBrands, and (iii) there were no communications between InQBrands and AAM/Cong other than a few phone calls concerning the trademark application. Wilsey, too, testified that InQBrands had no business relationship with Cong or AAM.

48. On December 4, 2024, the Court ordered Cong to submit his electronic devices to his counsel for search. After insisting for nearly one year that he lacked any responsive documents, Cong produced several thousand responsive documents on December 9, 2024, *i.e.*, the day fact discovery closed, including, *e.g.,* a plethora of emails exchanged with InQBrands, many of which concerned their joint creation of the NERNEX automotive brand while still employed by Walker. Cong produced brochures for the automotive components offered under the NERNEX brand, some of which featured InQBrands' logo and Wilsey's contact information and others of which included AAM's logo and Cong's contact information, with numerous Excel sheets substantiating these robust product offerings under the NERNEX brand, which incorporated Walker's Trade Secrets. In fact, some of these comprehensive Excel spreadsheets stored on Cong's computer were created while Cong remained employed by Walker, included Walker's Trade Secret information, and matched spreadsheets that Wilsey had transmitted to a Sensor Customer in connection with his successful effort to sell NERNEX parts to the Customer and thus replace the parts supplied by Walker. Notably, just days before Walker filed its lawsuit against Cong, Defendants had introduced Cong/AAM to one of the Sensor Customers to allow them to facilitate sales of automotive components directly.

49. Needless to say, Walker made diligent efforts to discover Defendants' wrongdoing, but Defendants successfully concealed their misconduct from Walker until December 2024 through relentless false representations.

50. Given Defendants' obstruction of Walker's reasonable investigation into their misconduct, Walker reserves the right to move to amend the Complaint

pursuant to Federal Rule 15 in the event discovery shows: (1) Defendants' misappropriation of trade secrets related to automotive components other than oxygen sensors, or (2) Wilsey's interference with Walker's economic relationships for the supply of automotive components other than oxygen sensors, throttle position sensors, and idle air control stepper motors.

## FIRST CAUSE OF ACTION

### (Trade Secret Misappropriation – 18 U.S.C. § 1836)

### (Against All Defendants)

51. Walker incorporates by reference as though fully set forth herein paragraphs 1, 19-24, 25-28, and 32-42 of this Complaint.

52. Walker maintains in confidence and derives significant value from its Trade Secrets. Due to their confidential nature, the Trade Secrets are immensely valuable to Walker. Walker has maintained reasonable efforts to protect its Trade Secrets, including providing its confidential information pursuant to nondisclosure provisions, such as the Confidentiality Agreement.

53. The Trade Secrets constitute protectible trade secrets under the Defend Trade Secrets Act (the "DTSA") pursuant to 18 U.S.C. §§ 1836-1839.

54. On information and belief, Defendants used, and continue to use, Walker's Trade Secrets to harm Walker by maliciously identifying and soliciting business from Walker's customers using the misappropriated trade secrets, and by selling oxygen sensors made by Walker's vendors that incorporate Walker's trade secrets.

55. Defendants intended their actions to cause financial and reputational harm to Walker, and their actions have caused such harm.

56. Defendants will continue to use Walker's trade secrets to harm Walker unless restrained by this Court.

57. Walker is entitled to damages for actual loss caused by the misappropriation of the trade secrets pursuant to 18 U.S.C. § 1836(b)(3)(B)(i)(I).

58. On information and belief, Defendants' use of the Trade Secrets has resulted in their unjust enrichment, entitling Walker to an order disgorging Defendants of their profits earned as a proximate result of their use of the Trade Secrets pursuant to 18 U.S.C. § 1836(b)(3)(B)(i)(II).

59. On information and belief, in misappropriating Walker's Trade Secrets, Defendants willfully and wantonly disregarded Walker's rights, entitling Walker to an award of exemplary damages under 18 U.S.C. § 1836(b)(3)(C).

60. On information and belief Defendants' misappropriation of Walker's Trade Secrets was willful and/or malicious, entitling Walker to an award of attorneys' fees under 18 U.S.C. § 1836(b)(3)(D).

61. As a direct and proximate result of Defendants' violations of the DTSA, Walker has suffered and will continue to suffer irreparable injury and loss. Walker has no adequate remedy at law for said injury and loss.

## SECOND CAUSE OF ACTION

**(Trade Secret Misappropriation – Cal. Civ. Code § 3426)**

**(Against All Defendants)**

62. Walker incorporates by reference as though fully set forth paragraphs 1, 19-24, 25-28, and 32-42 of this Complaint.

63. Walker maintains in confidence and derives significant value from its Trade Secrets. Due to their confidential nature, the Trade Secrets are immensely valuable to Walker. Walker has maintained reasonable efforts to protect its Trade Secrets, including providing its confidential information pursuant to nondisclosure provisions, such as the Confidentiality Agreement.

64. The Trade Secrets constitute protectible trade secrets under the California Uniform Trade Secrets Act ("UTSA"), Cal. Civil Code § 3426, *et seq*.

65. On information and belief, Defendants used, and continue to use, Walker's Trade Secrets to harm Walker by maliciously identifying and soliciting business from Walker's customers using the misappropriated trade secrets, and by

selling oxygen sensors made by Walker's vendors that incorporate Walker's trade secrets.

66. Defendants intended their actions to cause financial and reputational harm to Walker, and their actions have caused such harm.

67. Defendants will continue to use Walker's trade secrets to harm Walker unless restrained by this Court.

68. On information and belief, in misappropriating Walker's trade secrets, Defendants willfully and wantonly disregarded Walker's rights, entitling Walker to an award of exemplary damages under Cal. Civil Code § 3426.3(c).

69. On information and belief Defendants' misappropriation of Walker's trade secrets was willful and/or malicious, entitling Walker to an award of attorneys' fees under Cal. Civil Code § 3426.4.

70. As a direct and proximate result of Defendants' violations of the UTSA, Walker has suffered and will continue to suffer irreparable injury and loss. Walker has no adequate remedy at law for said injury and loss.

## THIRD CAUSE OF ACTION

**(Breach of Contract)**

**(Against Wilsey)**

71. Walker incorporates by reference as though fully set forth herein paragraphs 2, 25-26, 32, and 43 of this Complaint.

72. In exchange for employment with and compensation by Walker, Wilsey signed the Confidentiality Agreement, in which he agreed to maintain the confidentiality of the Trade Secrets.

73. The Confidentiality Agreement constitutes a valid, binding, and enforceable agreement.

74. Pursuant to the Confidentiality Agreement, Wilsey agreed that would neither use nor disclose Walker's confidential information following the termination of his employment with Walker.

75. Walker performed its obligations under the Confidentiality Agreement, namely, employing Wilsey and compensating him for said employment.

76. As described above, following the end of his employment with Walker, Wilsey disclosed and used Walker's Trade Secrets in a manner expressly prohibited by the Confidentiality Agreement.

77. Wilsey's use and disclosure of Walker's Trade Secrets constitutes a material breach of the Confidentiality Agreement.

78. Walker has been damaged as a direct and proximate result of Wilsey's breaches of contract. At present, Walker is unable to ascertain the full extent of its damages suffered by reason of the wrongful conduct described herein. Walker will ascertain and prove its damages at or prior to the trial of this action.

## FOURTH CAUSE OF ACTION

**(Intentional Interference with Prospective Economic Relations)**

**(Against Wilsey)**

79. Walker incorporates by reference as though fully set forth herein paragraphs 17-18, 29-31, 33, and 44 of this Complaint.

80. Through years of hard work and significant expenditure, Walker developed reliable, longstanding, and lucrative relationships with the two Sensor Customers. Walker derived significant value and economic benefit from these customer relationships and had a firm and reasonable expectation that such relationships would continue into the future.

81. Through his employment with Walker, Wilsey had knowledge of Walker's relationships with the Sensor Customers.

82. Wilsey engaged in conduct that was independently wrongful for sake of interfering with Walker's relationships with the Sensor Customers. Specifically, Wilsey breached his duty of loyalty to Walker by taking wrongful actions to develop a competing line of automotive components during his employment with Walker, which Wilsey and his agents then sought to sell (and did sell) to the Sensor

Customers. Regardless of whether Wilsey exploited Walker's Trade Secrets, the act of launching a competing automotive program while employed by Walker is independently wrongful and constitutes a breach of the duty of loyalty. *See* Cal. Lab. Code § 2863. Moreover, the interference impacts product lines that are not alleged to constitute the at-issue Trade Secrets, such as throttle position sensors and idle air control stepper motors.

83. Defendants intended to interfere with the economic relationships between Walker and its Sensor Customers, specifically seeking to divert these customers from Walker, given the reliable and lucrative nature of Walker's relationship with the Sensor Customers.

84. As a direct and proximate result of Defendants' tortious interference with Walker's economic relationships with its Sensor Customers, Walker has been damaged in an amount that will be shown according to proof at time of trial. Walker's damages include, but are not limited to, lost revenue and profits.

85. The above actions of Defendants were willful, wanton, fraudulent, and malicious, justifying an award of exemplary and punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Walker prays for an order and judgment against defendants, and each of them, as follows:

1. For judgment in Walker's favor on all causes of action;

2. For issuance of an order permanently enjoining Defendants, and their officers, agents, servants, employees, and all persons acting in concert or participation with them, from directly or indirectly using or communicating to any person any of the Trade Secrets, or other proprietary/confidential information;

3. For actual damages as alleged herein and proven at trial on the basis of Defendants' unlawful acts;

4. For disgorgement of the profits that Defendants earned as a proximate result of Defendants' disclosure and use of the Trade Secrets;

5. For exemplary damages pursuant to 18 U.S.C. § 1836(b)(3)(C) and California Civil Code § 3426.3(c);

6. For attorneys' fees incurred in the pursuit of this action pursuant to 18 U.S.C. § 1836(b)(3)(D), California Civil Code § 3426.4, and any other applicable statutory, contractual, or legal authority authorizing an award of attorneys' fees to the prevailing party;

7. For punitive and exemplary damages under California Civil Code § 3294 against Defendants;

8. For prejudgment interest at the maximum rate allowable by law;

9. For costs of suit incurred herein; and

10. For such further relief as this Court shall deem just and proper.

Dated: November 4, 2025

RUTAN & TUCKER, LLP
HANI Z. SAYED
BRADLEY A. CHAPIN
SARAH VAN BUITEN

By: _____
Bradley A. Chapin
Attorneys for Plaintiff
WALKER PRODUCTS, INC., a Missouri corporation

# **DEMAND FOR JURY TRIAL**

Walker hereby demands a jury trial as to all issues that are so triable.

Dated: November 4, 2025

RUTAN & TUCKER, LLP
HANI Z. SAYED
BRADLEY A. CHAPIN
SARAH VAN BUITEN

By: /s/ Bradley A. Chapin
Bradley A. Chapin
Attorneys for Plaintiff
WALKER PRODUCTS, INC., a Missouri corporation